**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALEX REID,<br><br>           Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>           Defendant. | Civil Action No. 15-416 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court upon the appeal of Alex Reid ("Plaintiff") from the final decision of the Commissioner upholding the final determination by Administrative Law Judge ("ALJ") Hon. Richard West partially denying Plaintiff's application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Although ALJ West found Plaintiff disabled beginning July 23, 2011, in this action Plaintiff seeks a finding of disability prior to that date. The relevant period before this Court is from August 1, 2007 (when the ALJ determined that Plaintiff's disability ceased) to July 23, 2011 (when the ALJ determined that Plaintiff became eligible for SSI).

The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g), and resolves this matter on the parties' briefs pursuant to Local Civil Rule 9.1(f). After reviewing the submissions of both parties, for the following reasons, the final decision of the Commissioner is affirmed.

## I.    BACKGROUND

### A.    Procedural History

On May 1, 1990, when Plaintiff was ten months old, an application for SSI was filed on Plaintiff's behalf.  (R.[1] 159-71.)  The Social Security Administration (SSA) determined that Plaintiff was disabled since March 1, 1990, due to bilateral hearing loss (left worse than right) and asthma.  (R. 36.)  In accordance with 42 U.S.C. § 1382c(a)(3)(H)(iii), SSA conducted an age-18 redetermination of Plaintiff's eligibility for SSI and found Plaintiff no longer disabled.  (R. 37-58, 82-94.)  Plaintiff requested a hearing, which was held on January 29, 2010, and on June 11, 2010, the ALJ found that Plaintiff was no longer disabled as of August 1, 2007.  (R. 37-51, 56-57, 82-94, 577-603.)

Plaintiff hired an attorney and filed an appeal to the Appeals Council on August 24, 2010 relating to the June 1, 2010 ALJ decision.  (R. 119, 122-23.)  While the appeal was pending, Plaintiff filed a subsequent (*i.e.*, new) application for SSI on September 30, 2010, alleging disability beginning June 12, 2010.  (R. 179.)

On November 18, 2011, the Appeals Council granted Plaintiff's request for review, vacated the June 11, 2010 ALJ decision, and remanded the case to the ALJ for further proceedings.  (R. 52-55.)  The Appeals Council also ordered that Plaintiff's subsequent claim for SSI be associated with the remanded case. (R. 54, 179.)

On remand, hearings were held on May 1, 2012 (R. 604-44) and January 11, 2013 (R. 645-93.)  On May 17, 2013 the ALJ issued a partially favorable decision finding Plaintiff disabled as of July 23, 2011 (the date Plaintiff suffered a brain aneurism), but not disabled between the August 1, 2007 cessation of benefits and July 23, 2011.  (R. 13-34.)

---

[1] "R." refers to the Administrative Record, which uses continues pagination and can be found at ECF No. 7.

On November 21, 2014, the Appeals Council denied Plaintiff's requested review of the ALJ's decision (R. 8-11) and Plaintiff thereafter commenced this action on January 21, 2015 (ECF No. 1). Both parties filed briefs in accordance with Local Civil Rule 9.1. (ECF No. 9, Brief in Support of Plaintiff Alex Reid ("Pl. Br."); ECF No. 11, Defendant's Brief Pursuant to Local Civil Rule 9.1 ("Def. Br.").) The matter is now ripe for resolution.

**B.    Factual History**

1. Plaintiff's Self-Reported Background

Plaintiff was born on April 26, 1989. (R. 159.) He graduated from high school with a mainstreamed 12th grade education. (R. 303, 585.) Plaintiff has no past relevant work history. (R. 191.)

On or about December 7, 2007, Plaintiff completed a function report. (R. 199-206.) Plaintiff stated that he lived in an apartment with his grandmother, that he spent his day at school (R. 199, 201, 203.). He reported that he had no general problem caring for his personal needs, that he could prepare simple meals (e.g., sandwiches and frozen dinners) and do his own laundry. (R. 200-01.) Plaintiff stated that he traveled by walking or using public transportation, that he could go out alone, and that he went shopping for food and clothing. (R. 202.) He reported that he was able to count change and pay bills (but he did not have a bank account), that he enjoyed watching television, listening to music, and playing videogames. (R. 202.) He further stated that he generally had no difficulty getting along with others (though he sometimes could not hear them) (R. 203, 205). Additionally, he reported that he had no difficulty lifting, squatting, bending, standing, reaching, sitting, kneeling, and using his hands and had a good ability to handle changes in routine. (R. 203, 205.)

2. Relevant Hearing Testimony

Hearings were held on January 29, 2010 (R. 577-603), May 1, 2012 (R. 604-44), and January 11, 2013 (R. 645-693).

On January 29, 2010, Plaintiff testified that he had graduated from high school and was going to Hudson Community College. (R. 585-86.) He stated that he had a hearing problem all of his life, that he sat in the front row in school so that he could hear, and that his hearing aids were broken for the past two months. (R. 587, 589.) Plaintiff testified that he also had ear infections and asthma, which was exacerbated by hot and cold weather. (R.594-95, 601.) Plaintiff reported that he went to school on a bus, lived with his grandmother, and assisted with the cooking. (R. 597-98.)

On May 1, 2012, Michele Reid, Plaintiff's aunt involved in Plaintiff's life since his infancy, testified on Plaintiff's behalf. (R. 607-08, 626-27.) Ms. Reid testified that Plaintiff lived with Ms. Reid's mother, who was wheelchair bound, and that Plaintiff had flunked out of Hudson County Community College. (R. 627-28.) Ms. Reid described Plaintiff as slow in movements, speech, and thinking, and she stated her belief that Plaintiff could not hold down a very simple job because of his thinking and inability to move fast enough. (R. 629, 636.) Ms. Reid reported that Plaintiff no longer wore hearing aids because he grew out of them and then lost his insurance. (R. 634.) Ms. Reid discussed Plaintiff's July 23, 2011 brain aneurysm, and she stated that since his surgery she noticed that Plaintiff was slower and his memory was poor, and he lost and forgot things easily. (R. 638-39.) She testified that Plaintiff was never outside the neighborhood alone because of the dangers his hearing loss could present. (R. 641.)

On January 11, 2013, an impartial vocational expert (VE) testified. (R. 686-95.) The ALJ asked whether there was work available in the national economy for someone who had Plaintiff's

vocational profile and RFC, and the VE advised that the individual could perform the requirements of representative medium occupations in the national economy such as laborer stores and supermarket bagger. (R. 23, 687-89.)

### 3. Medical Evidence Relating to Plaintiff's Medical Condition

According to the medical evidence in the record, Plaintiff underwent reconstructive surgery on his tympanic membrane in 2000 and 2001, and had tubes inserted in his ears. (R. 236.) When he wore hearing aids, Plaintiff was able to hear normally. (R. 236.) Plaintiff has had asthma since birth. (R. 237.) On January 16, 2007, Plaintiff visited the Pediatric Pulmonary Clinic at the New Jersey Medical School and his pulmonary exam was unremarkable. (R. 260-62.) The pulmonary function test revealed a mild to moderate airway obstruction and his moderate persistent asthma and chronic otitis media were controlled. (R. 261.)

On March 2, 2007, Lisa Bell, M.A., CCA-A, conducted an audiology evaluation of Plaintiff (R. 263.) Plaintiff's hearing aids were not functioning and in need of repair. (R. 263.) Plaintiff had pure tone thresholds consistent with a mild conductive hearing loss at 250-3kHZ sloping to a severe mixed hearing loss at 4k-8kHZ in the right ear, and a mild conductive hearing loss at 250-3kHz sloping to a moderate conductive hearing loss at 4k-8kHz in his left ear. (R. 263.) He had excellent speech discrimination when speech was presented at 55dBHL to each ear individually. (R. 263.)

On April 5, 2007, Plaintiff had a follow up visit with the Pediatric Pulmonary Clinic. (R. 257-59.) His pulmonary exam remained unremarkable, while his pulmonary function test continued to reveal a mild to moderate airway obstruction and a marked irreversible small airway obstruction. (R. 258.) Plaintiff had suboptimal control of his moderate persistent asthma, with his

smoking the cause of the small airway obstruction, while the record notes that Plaintiff had poor compliance with using asthma medication.  (R. 258.)

On June 28, 2007, Plaintiff had an office visit with Helen Aguila, M.D., from the New Jersey Medical School.  (R. 252-56.)  Plaintiff chiefly complained of asthma and allergies with coughing, but he admitted that he used his inhaled asthma medication only intermittently and Dr. Aguila found that Plaintiff was noncompliant with his medications.  (R. 252, 254.)  He denied night awakenings or as needed use of a bronchodilator.  (R. 252.)  He had no emergency room visits.  (R. 252.)  His physical and mental status exams were unremarkable (*e.g.*, no rales, rhonchi or wheezes, and normal range of motion and strength).  (R. 253-54.)  His pulmonary function test revealed a mild restrictive ventilator defect with a small airway obstruction.  (R. 254.)  Dr. Aguila found that Plaintiff's asthma symptoms were clinically controlled but with suboptimal control as reflected by his pulmonary function test.  (R. 252, 254.)

On July 30, 2007, Hongya Song, M.D., conducted a consultative evaluation of Plaintiff.  (R. 270-76.)  Plaintiff contended that he had asthma attacks every two to three months and "mild" shortness of breath in between his asthma attacks.  (R. 270.)  His left ear looked like his eardrum was possibly perforated; his right ear was within normal limits.  (R. 271.)  Plaintiff had no trouble hearing when Dr. Song and his staff talked to him in a low voice.  (R. 271.)  The remainder of his physical exam was unremarkable (*e.g.*, he had 5/5 strength and full range of motion of his joints).  (R. 271.)

On September 6, 2007, Plaintiff returned to the Pediatric Pulmonary Clinic.  (R. 249-51.)  Plaintiff reported that he was asymptomatic.  (R. 249.)  His pulmonary exam was unremarkable, and his moderate persistent asthma was clinically controlled despite his poor compliance, and his chronic otitis media was also controlled.  (R. 250, 251.)

On August 16, 2007, N. Galakos, M.D., a physician consultant who worked for the State agency, reviewed Plaintiff's file and opined that he could perform a wide range of medium work. (R. 277-84.)  On February 6, 2008, Toros Shahinian, M.D., another physician consultant, affirmed Dr. Galakos's opinion.  (R. 278-81, 285.)  On February 11, 2008, H. P. Yeager, M.D., a physician consultant, found Plaintiff could perform work with limited hearing (high frequency hearing loss) and avoided moderate exposure to wetness, humidity, and noise.  (R. 288-95.)

On January 9, 2009, Plaintiff was medically cleared to receive hearing aids.  (R. 485.)  On February 16, 2009, Plaintiff followed up with Dr. Aguila for monitoring of his asthma.  (R. 486-89.)  Plaintiff acknowledged that he was generally noncompliant with his medication therapy, *e.g.*, he only took his albuterol nebulizer when he was "sick."  (R. 486.)  His pulmonary exam was unremarkable (*e.g.*, no rales, rhonchi, and wheezing).  (R. 487.)  Dr. Aguila explained to Plaintiff that he needed to use his preventive asthma medication.  (R. 489.)  On April 20, 2009, Plaintiff returned to see Dr. Aguila.  (R. 490-93.)  Although Plaintiff remained noncompliant with his medication therapy, he had no acute asthma-related problems, and his symptoms were well controlled.  (R. 490.)  Dr. Aguila referred Plaintiff to an ear, nose, and throat (ENT) specialist for his chronic otitis media.  (R. 493.)  On August 19, 2009, Plaintiff followed up with Dr. Aguila and he reported no active problems or symptoms; his asthma symptoms were controlled; and there was no need for use of a rescue bronchodilator, emergency room visit, or an asthma related visit with his primary care practitioner.  (R. 496-99.)

On January 27, 2010, Plaintiff sought emergency room treatment for cerumen impaction and a sore throat.  (R. 299-302.)  On September 17, 2010, Plaintiff saw Ray Scarpa, A.P.N. C.N.S., for an ear evaluation, complaining that his left ear was bleeding for four days, but that the bleeding had stopped the night before.  (R. 501.)  Mr. Scarpa reported that no gross hearing deficits were

noted during his conversation with Plaintiff. (R. 501.) Mr. Scarpa confirmed that Plaintiff had recurrent cholesteatoma via a CT scan. (R. 501-02.) On November 10, 2010, Plaintiff saw Robert Jyung, M.D., for an ENT evaluation and Dr. Jyung noted that Plaintiff was "lost" to follow up for the past three years, and that Plaintiff complained that his hearing gradually worsened over the past few years. (R. 502-03.) Plaintiff denied any vertigo or tinnitus, and Dr. Jyung assessed Plaintiff with left cholesteatoma and prescribed medication. (R. 502.)

By May 1, 2011, Plaintiff had begun seeking treatment with Saquiba Syed, M.D., an internal medicine specialist. (R. 438-41, 471-75, 479.) Plaintiff had post-nasal discharge (allergic rhinitis) but, otherwise, his physical exam was unremarkable. (R. 440.) Dr. Syed noted that Plaintiff was noncompliant with his medication regimen but compliant with current therapy. (R. 440.) On June 3, 2011, Plaintiff returned to see Dr. Syed and it was noted that Plaintiff was smoking. (R. 442-46.) He was negative for cluster headaches, migraine headaches, dyspnea and wheezing and his physical exam was unremarkable. (R. 443-45.) On July 20, 2011, Plaintiff returned to Dr. Syed's office, complaining of fluctuating asthma, a persistent cough, and fluctuating chest pain (all relieved with his asthma medication), and stable acquired anemia (due to a Vitamin B12 deficiency and managed through Vitamin B12 injections). (R. 515-19.) Plaintiff's physical exam revealed diffuse wheezing and he was diagnosed with pharyngitis with no evidence of systemic disease, but was other was clinically and medically stable. (R. 517-18.)

Between July 23 and August 6, 2011, Plaintiff was hospitalized for a subarachnoid hemorrhage (secondary to a ruptured anterior communicating aneurysm) that developed after he was "fooling around" with his friends and fell and hit the floor. (R. 308-09, 312-433.) While hospitalized, he underwent a right craniotomy and clipping of his complex anterior communicating artery aneurysm (with an intraoperative angiogram). (R. 323-27.) A consultative evaluation

revealed that Plaintiff's asthma was well controlled, with no hospitalizations or emergency room visits since childhood despite Plaintiff's smoking habit. (R. 319.) Plaintiff underwent a cognitive-communication evaluation, performed by Arlene Burnett, S.L.P. (R. 417-20.) Plaintiff reported that he wore hearings aids at all times prior to the accident, and he denied any pain. (R. 418.) Plaintiff communicated effectively for basic functional limitations, but he demonstrated decreased initiation and his responses were unelaborative. (R. 419.) Ms. Burnett concluded that Plaintiff had a moderate cognitive-linguistic impairment(s) (*e.g.*, a decreased ability to carry out and follow through with functional problem solving in the most effective, efficient manner). (R. 419.) His cognition appeared to be a barrier to learning, and he participated in individual cognitive-communication speech therapy while hospitalized. (R. 419, 420-21, 427-28.)

It appears that sometime around January 11, 2012, Dr. Syed completed a general medical report in which he stated that she had seen Plaintiff every four weeks between August 13, 2010 and June 3, 2011. (R. 480-82.) Plaintiff had a medical history of asthma and deafness, and hospitalized for a brain aneurysm and his diagnoses included a brain aneurysm, bilateral deafness, a learning disability, asthma, and allergies. (R. 480-81.) Dr. Syed stated that Plaintiff could not work an eight-hour workday, but did not identify any specific functional limitations relative to Plaintiff's asthma and hearing. (R. 480-82.) On January 27, 2012, Plaintiff received an injection for wheezing, while a review of his respiratory systems was generally negative (*e.g.*, no dyspnea or frequent upper respiratory infection, etc.) and his pulmonary exams were generally unremarkable (lungs clear to auscultation, etc.). (R. 533-57.) On April 2, 2012, he was instructed to follow up with a neurologist for a benign neoplasm of the brain. (R. 550.)

### 4. <u>Medical Evidence Relating to Plaintiff's Mental Condition</u>

On July 7, 2003, Joseph Lamanna, D. Ed., conducted a consultative evaluation of Plaintiff when he was 14 years old. (R. 241-48.) He was in the 8th grade in regular education, and received speech therapy services. (R. 241, 245). On the Wechsler Intelligence Scale for Children-III (WISC-III), he earned a verbal IQ ("VIQ") score of 90, a performance IQ ("PIQ") score of 69, and a full scale IQ score of 77. (R. 243.) Dr. Lamanna reported that the discrepancies between the verbal scale IQ and the performance scale IQ were frequently found in individuals who had a perceptual motor-based learning disability. (R. 243.) On the Wide Range Achievement Test-III (WRAT-III), he read at the 2nd grade level. (R. 242.) Dr. Lamanna diagnosed dysthymic disorder and reading disorder but Dr. Lamanna concluded that Plaintiff's overall intellectual functioning appeared about average. (R. 244, 247-48.)

On April 17, 2010, Ernesto Perdomo, Ph.D., a licensed psychologist, conducted a psychological evaluation of Plaintiff, to which Plaintiff arrived alone by public transportation. (R. 303-06.) The records state that Plaintiff finished high school in a regular education program. (R. 303, 306.) His hearing aids were broken, and his last hearing aid was reportedly lost. (R. 303-04.) Dr. Perdomo tested Plaintiff on the Wechsler Adult Intelligence Scale-IV Edition (WAIS-IV), where he earned 80 on the verbal comprehension index ("VCI"), 90 on the perceptual reasoning index ("PRI"), 95 on working memory, 79 on processing speed, and 82 on a full scale IQ score. (R. 304-05.) Dr. Perdomo reported that Plaintiff's scores were at least within the low average range. (R. 305.) On the Wechsler Memory Scale-III Edition (WMS-III), Plaintiff earned good scores in all areas of tested memory without any significant deficits, and Dr. Perdomo concluded that Plaintiff had no cognitive or memory dysfunction. (R. 306.)

On October 24, 2012, Dr. Perdomo re-evaluated Plaintiff.  (R. 509-13.)  Plaintiff arrived with a family friend by public transportation due to the fact that Plaintiff did not go out alone too far from home.  (R. 509.)  On the WAIS-IV, his VCI was 68; his PRI was 79; his working memory standard index was 74; his processing speed standard index was 74, and his full scale IQ was 69.  (R. 510.)  His full scale IQ fell within the mental deficiency range and placed him at the 2% range in the population with a 95% confidence intervals between a standard IQ of 66 and a standard IQ of 74 according to the WAIS-IV.  (R. 510.)  Dr. Perdomo observed that significant deficits were within the mental deficiency range and noticed in areas dealing with verbal concept formation, reasoning, and knowledge required.  (R. 511.)  Overall, Dr. Perdomo thought that Plaintiff appeared to be within the mental deficiency range with significant ability in the borderline range according to the WAIS-IV, thus placing him within the upper mental deficiency range to borderline range of intellectual functioning with significant learning disabilities.  (R. 511-12.)

## II.    STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).  Substantial evidence is "more than a mere scintilla but may be less than a preponderance."  *Woody v. Sec'y of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).  It "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted).  Not all evidence is considered substantial.  For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). It does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. *Monsour Med. Ctr. V. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (citing *Hunter Douglas, Inc. v. Nat'l Labor Relations Bd.*, 804 F.2d 808, 812 (3d Cir. 1986)). "[T]he district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)). A Court must nevertheless "review the evidence in its totality." *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)). In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" *Id.* (citing *Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988)).

A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record his reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler,* 786 F.2d 581 (3d Cir. 1986)). If the ALJ fails to properly indicate why evidence was discredited or rejected, the Court cannot determine whether the evidence was discredited or simply ignored. *See Burnett v. Comm'r of Soc. Sec,* 220 F.3d 112, 121 (3d Cir. 2000) (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

### III.   APPLICABLE LAW

#### A.   The Five-Step Process for Evaluating Whether a Claimant Has a Disability

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382. Pursuant to the Act, a claimant is eligible for benefits if he meets the income and resource limitations of 42 U.S.C. §§ 1382(a)(1)(A)-(B) and demonstrates that he is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A person is disabled only if his physical or mental impairment(s) are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether the claimant is disabled, the Commissioner performs a five-step sequential evaluation. 20 C.F.R. § 416.920. The claimant bears the burden of establishing the first two requirements. The claimant must establish that he (1) has not engaged in "substantial gainful activity" and (2) is afflicted with "a severe medically determinable physical or mental impairment." 20 C.F.R. § 416.920(a)(4)(i)-(ii). If a claimant fails to demonstrate either of these two requirements, DIBs are denied and the inquiry ends. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant successfully proves the first two requirements, the inquiry proceeds to step three which requires the claimant to demonstrate that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Part 404 Appendix 1. 20 C.F.R. § 416.920(a)(4)(iii). If the claimant demonstrates that his impairment meets or equals one of the listed impairments, he is presumed to be disabled and therefore, automatically entitled to DIBs. *Id.* If he cannot make the required demonstration, further examination is required.

The fourth step of the analysis asks whether the claimant's residual functional capacity ("RFC") permits him to resume his previous employment. 20 C.F.R. § 416.920(a)(4)(iv). If a claimant is able to return to his previous employment, he is not disabled within the meaning of the Act and is not entitled to DIBs. *Id*. If the claimant is unable to return to his previous employment, the analysis proceeds to step five. At this step, the burden shifts to the Commissioner to demonstrate that the claimant can perform a job that exists in the national economy based on the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 416.920(g). If the Commissioner cannot satisfy this burden, the claimant is entitled to DIBs. *Yuckert*, 482 U.S. at 146 n.2.

**B.    The Requirement of Objective Evidence**

Under the Act, disability must be established by objective medical evidence. "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [Commissioner] may require." 42 U.S.C. § 423(d)(5)(A). Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section." *Id*. Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

*Id*.; *see* 42 U.S.C. § 1382c(a)(3)(A). Credibility is a significant factor. When examining the record: "The adjudicator must evaluate the intensity, persistence, and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability

14

to do basic work-related activities." SSR 96-7p, 1996 WL 374186 (July 2, 1996).  To do this, the

adjudicator must determine the credibility of the individual's statements based on consideration of

the entire case record.  *Id.*  The requirement for a finding of credibility is found in 20 C.F.R. §

416.929(c)(4).   A claimant's symptoms, then, may be discredited "unless medical signs or

laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. §

416.929(b); *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

The list of "acceptable medical sources to establish whether [a claimant] has a medically

determinable impairment" includes licensed physicians, but does not include nurses.  20 C.F.R. §

404.1513(a).  Though the ALJ "may also use evidence from other sources to show the severity of

[a claimant's] impairments," this evidence is "entitled to consideration as additional evidence" and

does not need to be given the same weight as evidence from acceptable medical sources.  20 C.F.R

§ 404.1513(d)(1); *Hatton v. Comm'r of Soc. Sec.,* 131 Fed. App'x 877, 878 (3d Cir. 2005).  Factors

to consider in determining how to weigh evidence from medical sources include (1) the examining

relationship, (2) the treatment relationship, including the length, frequency, nature, and extent of

the treatment, (3) the supportability of the opinion, (4) its consistency with the record as a whole,

and (5) the specialization of the individual giving the opinion.  20 C.F.R. § 404.1527(c).

## IV.    DISCUSSION

### A.    ALJ Miller's Decision

On May 17, 2013, ALJ West issued a partially favorable decision, finding that Plaintiff's

disability ceased as of August 1, 2007, but that he became disabled again on July 23, 2011.  (R.

20-34.)  In particular, and relevant to this appeal, at step two the ALJ found that Plaintiff had the

following severe impairments since August 21, 2007: bilateral hearing loss, asthma, and borderline

intellectual functioning. (R. 20.)  Beginning on July 23, 2011, the established onset date of

disability, the ALJ found that in addition to these impairments, Plaintiff also had severe impairments due to obesity and memory loss status post a brain aneurysm. (R. 20.) At step-three, the ALJ concluded that Plaintiff did not have an impairment(s) that met or medically equaled the severity requirements of an impairment in the listings, including § 2.10, § 3.02, § 3.03, § 12.02, § 12.05, and Social Security Ruling (SSR) 02-1p, since August 1, 2007. (R. 20-23.) *See generally* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 2.10, 3.02, 3.03, 12.02, 12.05; SSR 02-1p, 67 Fed. Reg. 57859 (2002).

Before proceeding to step four, the ALJ concluded that, prior to July 23, 2011, Plaintiff had the RFC to perform medium work (as defined in 20 C.F.R. § 416.967(c)) except that he: (1) could climb occasionally; (2) had to avoid concentrated exposure to extreme cold, heat, dust, and similar occupational irritants; (3) had to avoid any exposure to loud noise, wetness, and humidity; (4) could understand, remember, and carry out short simple instructions; and (5) could use the telephone occasionally. (R. 23-30.) At step four, the ALJ determined that Plaintiff had no past relevant work. (R. 32). At step five, the ALJ concluded that prior to July 23, 2011, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform given his vocational profile and RFC, consistent with the VE's testimony. (R. 32-33.) Therefore, the ALJ concluded that Plaintiff's disability ceased on August 1, 2007, and his receipt of SSI was correctly ceased at that time, but that beginning on July 23, 2011, there were no significant jobs in the national economy that Plaintiff could perform because he was unable to remember even simple work-related tasks on a sustained basis, and so consequently, he was eligible for SSI. (R. 30, 33.)

**B.    Substantial Evidence Supports the Commissioner's Decision That Plaintiff's Impairments Did Not Medically Equal the Severity Requirements of the Listings Prior to July 23, 2011.**

Plaintiff contends that the ALJ's decision inexplicably concludes that Plaintiff was disabled for the first 18 years of life due to congenital abnormalities and pathologies, disabled again from age 22 through the present because of a traumatically induced and surgically corrected aneurism, but fully able between the ages of 18 to 22 to perform every unskilled medium job in the country which doesn't require use of a telephone for more than 2 hours and 40 minutes a day.  (Pl. Br. at 18-25.)  Plaintiff asserts that he meets § 12.05C of the Commissioner's listings and that the ALJ erred by finding otherwise and discounting certain IQ scores.  (*Id.* at 24.)  Additionally, Plaintiff argues that the ALJ failed to combine all severe impairments and compare the joint effect of all impairments against one of the Commissioner's Listings to determine medical equivalence.  (*Id.* at 24-25.)

Defendant argues that the ALJ adequately explained why Plaintiff's impairments did not satisfy the requirements of several listings, including § 2.10 (hearing loss), § 3.02 (chronic pulmonary insufficiency), § 3.03 (asthma), and § 12.05 (borderline intellectual functioning), either individually or in combination.  (Def. Br. at 15-17.)  Defendant further argues that the ALJ's determination with respect to § 12.05 is supported by substantial evidence and asserts that Plaintiff's borderline intellectual functioning did not medically equal the requirements of § 12.05C because Plaintiff did not have a significant subaverage general intellectual functioning demonstrated by a valid verbal, performance, or full scale IQ of 60 through 70 between August 1, 2007 and July 23, 2011 (*id.* at 18-22), and Plaintiff did not satisfy the requisite introductory paragraph of § 12.05 by demonstrating that he had deficits in adaptive functioning initially manifested during the developmental period of 22 (*id.* at 23-25).

17

The Court agrees with Defendant because substantial evidence supports the ALJ's finding that Plaintiff's impairments did not medically equal the severity requirements of the listings prior to July 23, 2011. The Court has thoroughly reviewed the medical evidence and the ALJ's decision and finds that the ALJ adequately explained why Plaintiff did not meet the listings in light of the medical evidence in the record. (*See* R. 20-21.)

First, the Court notes that aside from § 12.05C (borderline intellectual functioning), Plaintiff cites to no evidence showing that his condition was "equivalent" to any of the other listings. "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 CFR § 416.926(a); SSR 83-19, at 91-92). Because Plaintiff has not presented the Court with evidence any evidence showing why Plaintiff is equivalent or how the ALJ erred, he has not met his burden with respect to § 2.10 (hearing loss), § 3.02 (chronic pulmonary insufficiency), and § 3.03 (asthma). *Id.* Furthermore, an impairment is medically equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). If a claimant has a combination of impairments, no one of which meets a listing, the Commissioner's task is compare the findings with those for "closely analogous listed impairments." *Id.* § 416.926(b)(3). Significantly, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Again, it is the plaintiff who "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.*

Plaintiff's lack of citation to relevant medical evidence is fatal to his generalized claim that the ALJ failed to engage in a combination analysis. *Id.*

Second, with respect to § 12.05C, the ALJ explicitly and thoroughly discussed Plaintiff's borderline intellectual functioning under this listing in its entirety. (R. 21-22 (analyzing requirements on paragraphs A through D.) *See* 20 C.F.R. pt. 404, subpt. P. app. 1, § 12.05. Section 12.05C provides as follows:

> 12.05 *Intellectual disability:* Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>     The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>     C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

*Id.*

The ALJ considered Plaintiff's three IQ test results in the record: (1) the July 2003 WISC-III PIQ score of 69; (2) the April 2010 WAIS-IV full scale IQ score of 82; and (3) the October 2012 WAIS-IV full scale IQ score of 69. (R. 21, 243, 305, 510.) The 2003 score was not discussed in the opinion, but the ALJ appropriately analyzed the scores from 2010 and 2012.

With respect to the July 2003 score of 69, the regulations state that an IQ score must be sufficiently current for an accurate assessment under the listings. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D10. "IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above." *Id.* As the ALJ explained during the hearing, the 2003 PIQ score obtained from Plaintiff when he was 14 years old, was not current under the regulations. (R. 613-14; *see also* 241, 245.)

The April 2010 full scale IQ score of 82 was obtained when Plaintiff was 20 years old, prior to Plaintiff's brain aneurysm, and was appropriately relied upon by the ALJ. Plaintiff suggests that this score is less reliable because the testing revealed no results regarding Plaintiff's verbal or performance IQ. (Pl. Br. at 13-14.) However, as Defendant points out, Dr. Perdomo did report that Plaintiff had obtained a VCI score of 80 and a PRI score of 90 (R. 304) and courts have found that the VCI and the PRI are functionally equivalent to the VIQ and PRI scores used in the Wechsler Adult Intelligence Scale-III. *See Pierson v. Colvin*, 960 F. Supp.2d 933, 937 n.5 (S.D. Iowa 2013); *see, e.g., Plank v. Colvin*, No. 12-4144, 2013 WL 6388486 at *7 (E.D. Pa. Dec. 6, 2013) (noting that guidance provided by the Wechsler Series Test administrators indicate that the terms VCI and PRI should be substituted from the terms VIQ and PIQ in clinical decision-making and other situations where the VIQ and PIQ were previously used). Accordingly, the 2010 WAIS-IV results showed a full-scale IQ of 82, a VIQ-equivalent of 80, and a PIQ-equivalent of 90, which further supports the ALJ's determination that Plaintiff did not have a current valid IQ score of 60 through 70 as required under § 12.05C.

Finally, with respect to the October 2012 full-scale score of 69, the ALJ adequately explained why this score was not as reliable as the April 2010 score. (R. 21-22.) For example, the ALJ gave "great" weight to Dr. Perdomo's 2010 assessment for the period extending through July 22, 2011 given Plaintiff's performance in school, his range of daily activities, and his presentation at the January 2010 hearing. (R. 22, 29.) *See* 20 C.F.R. § 416.927(c)(3)-(4). Furthermore, substantial evidence supports the ALJ's conclusion that Plaintiff's mental functioning deteriorated after his July 2011 brain aneurysm. (R. 22, 30-31.) The ALJ reported that Plaintiff's EEG findings post-aneurysm could possibly be consistent with bilateral and focal cerebral dysfunction, and further noted Plaintiff's therapy records reflected that he was unable to

recall his aunt's name and whether or not she was involved in his life, he appeared to be slightly more confused that day than days before, and he had mild cognitive deficits. (R. 30.) Additionally, the ALJ noted that Plaintiff's aunt testified post-aneurysm that Plaintiff was slower and he lost and forgot things easily. (R. 22, 31.) This evidence was consistent with the "dramatic" drop observed in Plaintiff's IQ scores between 2010 and 2012 in light of the intervening brain aneurysm and accordingly the Court finds that substantial evidence supports the ALJ's decision.

### C.   Substantial Evidence Supports the ALJ's Formulation of Plaintiff's Residual Functional Capacity for the Period Prior to July 23, 2011.

The ALJ found that prior to July 23, 2011, Plaintiff retained the RFC to perform medium work (as defined in 20 C.F.R. § 416.967(c)) except that he (1) could only do occasional climbing; (2) had to avoid concentration exposure to extreme cold, heat, dust, and similar occupational irritants; (3) had to avoid exposure to loud noises, wetness, and humidity; (4) could only occasionally use the telephone; and (5) could understand, remember and carry out simple instructions. (R. 23.)

Plaintiff argues that the decisional RFC is not based on substantial evidence. (Pl. Br. at 25-30.) In particular, Plaintiff contends that the ALJ's determination that Plaintiff could "understand, remember and carry out simple instructions" (R. 23) is conclusory and lacking in evidentiary support, especially in light of the fact that Plaintiff's IQ was only 69 in 2003 and 2012. (*Id.*). Additionally, Plaintiff asserts that the ALJ erred by failing to acknowledge that if Plaintiff required an extra break in the work day, Plaintiff could not perform the two jobs cited by the VE. (*Id.*).

Defendant argues that substantial evidence supports the ALJ's RFC determination. Defendant points out that the ALJ specifically cited to Plaintiff's full-scale IQ score of 82 from 2010 in addition to Plaintiff's hearing impairment in reaching his conclusion that that Plaintiff was

restricted to the simple tasks of unskilled work, and that the ALJ found "little evidence" to support a conclusion that Plaintiff would be unable to perform such work. (Def. Br. at 25-26.) Defendant further argues that the questioning of the VE was appropriate because Plaintiff failed to demonstrate that he medically needed extra breaks during the day. (*Id.*).

The Court agrees with Defendant and finds that substantial evidence supports the ALJ's formulation of Plaintiff's RFC in the period preceding July 23, 2011 and that the questions posed to the VE were appropriate. During the relevant period, Plaintiff's only severe mental impairment was his borderline intellectual functioning. (R. 20.) The ALJ relied heavily on Dr. Perdomo's 2010 reports in reaching his RFC conclusion. (*See* R. 20-23.) As noted, on April 17, 2010, Dr. Perdomo tested Plaintiff on the Wechsler Adult Intelligence Scale-IV Edition (WAIS-IV), where he earned 80 on the verbal comprehension index, 90 on the perceptual reasoning index, 95 on working memory, 79 on processing speed, and 82 on a full scale IQ score. (R. 304-05.) Dr. Perdomo reported that Plaintiff's scores were at least within the low average range. (R. 305.) On the Wechsler Memory Scale-III Edition (WMS-III), Plaintiff earned good scores in all areas of tested memory without any significant deficits, and Dr. Perdomo concluded that Plaintiff had no cognitive or memory dysfunction. (R. 306.) Additionally, Dr. Perdomo found that Plaintiff spoke coherently and relevantly, was calm and sociable, was oriented, had an organized and focused thought process, and displayed no indication of any thought disorder or psychosis. (R. 304.)

In addition to the medical evidence from Dr. Perdomo, the ALJ cited to Plaintiff's daily-living activities in support of his RFC assessment. (R. 22.) For example, the ALJ specifically noted that Plaintiff could "independently maintain self-care, assist his grandmother with cooking meals, do[] his laundry three times a month, shop for food and clothes, watch television, play video games, and walk to the corner store." (*Id.* (citing Ex. 2E).). Additionally, the ALJ noted that

Plaintiff "got along with authority figures; spent time with others everyday [sic]; and that he attended school every day without incident." (*Id.* (citing Ex. 2F).) Even as late as January 2013, the ALJ noted that Plaintiff said that he enjoyed helping his friend, who was an aspiring rap artist, write "hooks" and lyrics for his songs. (R. 22, 25, 28.)

Thus, the Court finds that substantial evidence supports the ALJ's RFC assessment. Specifically, the ALJ adequately explained why Plaintiff could perform the simple tasks of unskilled work during the relevant time period. Therefore, the Court finds that the hypothetical questions posed to the VE were appropriate, since such questions must reflect each of Plaintiff's impairments that are adequately supported by the objective medical findings in the record. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) ("A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence.") (citation omitted). Although Plaintiff claims that he needs extra breaks during the day, he points to no objective medical evidence in support of this claim. Accordingly, the Court finds no error on the part of the ALJ in this regard.

## V.    CONCLUSION

For the foregoing reasons, the decisions of the Commissioner and the ALJ are affirmed. An appropriate order follows this Opinion.

DATED: 10/5/15.

JOSE L. LINARES
U.S. DISTRICT JUDGE